# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | 2:21-CR-440 |
| ) | |
| GREGORY VICTOR BROWN, ) | |
| ) | |
| Defendant. ) | |

## OPINION

### J. Nicholas Ranjan, United States District Judge

Defendant Gregory Brown was arrested and charged with one count of possession of a weapon and ammunition by a felon (in violation of 18 U.S.C. § 922(g)(1)) after police recovered a firearm during a routine traffic stop. Mr. Brown now moves to suppress all evidence recovered and all statements made during the stop, search, and arrest. After carefully reviewing the relevant facts, legal authorities, and the parties' cogent and well-written briefs, the Court will deny the motion.

## FACTUAL FINDINGS

The Court's factual findings are based on the evidence submitted and the credible witness testimony adduced at the December 2022 suppression hearing.

On September 27, 2021, a silver Kia failed to yield to an oncoming unmarked police vehicle driven by Lieutenant Brandon Rourke and Detective Michael Catanzaro of the Wilkinsburg Police Department, nearly colliding with it. ECF 95, 14:1-15:23. Lt. Rourke, the driver, slammed the brakes to avoid a collision, made a U-turn, and caught up to the Kia—the officers could see the driver, Mr. Brown, bending over and about the cabin. *Id.* at 15:4-9, 18:4-19:19; ECF 97, 42:10-19. Then, before the officers initiated the traffic stop, the passenger-side door opened and Shimica Buckner, the Kia's passenger and lawful owner (though a passenger at the

time), attempted to exit the vehicle while it idled. ECF 95, 18:6-18, 36:10-15; ECF 97, 42:22-24. At that point, the officers activated their vehicle's emergency lights and directed the Kia to pull over to the side of the road. *Id.*

After securing the vehicle, Lt. Rourke checked Mr. Brown's identification and determined that his driving privileges were suspended and that he did not have a valid driver's license. ECF 97, 14:16-20, 17:15-24. Det. Catanzaro directed Mr. Brown to exit the vehicle because he could not lawfully operate it; for safety reasons, he decided to conduct a pat-down of Mr. Brown. ECF 95, 38:3-39:14. Before Det. Catanzaro began the pat-down, Mr. Brown fidgeted, and Det. Catanzaro observed a crack pipe in Mr. Brown's pocket in plain view; as explained in more detail below, the Court's review of the dashcam footage corroborates that account. *Id.* at 39:21-42:22; Govt Ex. 2. Det. Catanzaro removed and placed the pipe on the street, completed the pat-down, and directed Mr. Brown to sit on the curb. ECF 97, 40:4-45:10. Then, Det. Catanzaro proceeded to the passenger side to speak to Ms. Buckner and pat her down. *Id.* at 45:11-17. After the pat-down, Ms. Buckner advised Det. Catanzaro that Mr. Brown had a gun. *Id.* at 46:2-6. Contemporaneously, Lt. Rourke placed the crack pipe on the driver's seat to ensure the evidence was not destroyed, at which point he spotted a gun in plain view protruding from beneath the seat. ECF 97, 25:24-26:23.

Lt. Rourke then showed Det. Catanzaro the location of the firearm, and Det. Catanzaro leaned into the open passenger-side area of the car to see it. ECF 95, 47:18-24; Govt Ex. 2 (06:05-06:20). He then advised Mr. Brown and Ms. Buckner of their *Miranda* rights. ECF 95, 47:21-48:13; ECF 97, 29:3-13. Mr. Brown waived his rights and admitted that he did not have a concealed carry permit and that he was a felon. ECF 95, 48:14-51:6. When he denied that the firearm was his, Ms. Buckner stated, unprompted, that the firearm in fact was Mr. Brown's. ECF 95, 49:23-50:2. The officers took Mr. Brown to the Wilkinsburg Police Department, where he signed a form acknowledging that they read him his rights on scene, and that he understood

those rights. *Id.* at 51:12-54:11. Before leaving the scene, Ms. Buckner also made a statement that Mr. Brown placed the firearm under the driver's seat before the officers initiated the stop, and that the officers advised Mr. Brown and Ms. Buckner of their rights. *Id.* at 56:16-57:5.

Mr. Brown moved to suppress all evidence seized during the stop, including the firearm, as well as any statements he made to the police both during and after the stop. ECF 51, pp. 1-2. This Court held a two-day evidentiary hearing on December 14, 2022 (ECF 84) and December 22, 2022 (ECF 89), after which the parties submitted post-hearing briefing. The motion is now ready for disposition.

## DISCUSSION & ANALYSIS

Mr. Brown points to three bases for suppression. First, he argues that the officers lacked reasonable suspicion or probable cause to initiate the traffic stop in the first place. ECF 51, p. 5. Second, he argues that Det. Catanzaro's pat-down search unlawfully extended the stop in contravention of *Rodriguez v. United States*, 575 U.S. 348 (2015), or else the frisk exceeded the scope of a pat-down search permitted by *Terry v. Ohio,* 392 U.S. 1 (1968). ECF 51, pp. 6, 8. And third, he argues that the officers lacked probable cause to search the vehicle, which also unlawfully extended the traffic stop. *Id.* at 9. But the evidence presented at the suppression hearing, including the dashcam video of the incident, shows that the officers acted within the bounds of the Fourth and Fifth Amendments at each step of their search and seizure of Mr. Brown and the vehicle. Thus, Mr. Brown's motion must fail.

**I.    The officers had the requisite reasonable suspicion to initiate the traffic stop.**

Mr. Brown argues that the officers lacked reasonable suspicion or probable cause to initiate a traffic stop based on traffic violations for failure to use a turn signal or careless driving, as reflected in Det. Catanzaro's incident report. ECF 99, p. 15. Using the officers' dashcam video, Mr. Brown points to the clear use of a turn signal,

and the presence of a large bush that allegedly obstructed his view and forced him to use caution and creep into the intersection. *Id.* at 16-18. This, he argues, means entering the intersection wasn't "careless," at least as defined by the careless-driving statute. ECF 99, pp. 15-18. The problem for Mr. Brown is the officers didn't have to be right; they only had to be reasonable. And here, they were.

"Traffic stops are classified as a type of *Terry* stop, and may be initiated based on a reasonable suspicion that a traffic violation has occurred." *United States v. Green*, 897 F.3d 173, 178 (3d Cir. 2018) (citing *Navarette v. California*, 572 U.S. 393 (2014)). A traffic stop is reasonable "when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating the traffic law at the time of the stop. This standard is not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts." *United States v. Fleetwood*, 235 F. App'x 892, 895 (3d Cir. 2007) (cleaned up). Instead, the officer "need only produce facts establishing that [he] reasonably believed that a violation had taken place." *Id.*

The evidence supports that the officers had an objective reasonable suspicion that Mr. Brown had committed a traffic violation when turning into the intersection. At the suppression hearing, Det. Catanzaro credibly testified that he observed violations of traffic laws addressing Duties at a Stop Sign (75 Pa. C.S.A. § 3323), Careless Driving (75 Pa. C.S.A. § 3714), and Using a Turn Signal (75 Pa. C.S.A. § 3334(b)). ECF 95, 16:3-12; ECF 106, pp. 7-8. He also "provided specific, articulable facts that support an objective determination of reasonable suspicion of the alleged traffic infraction." *United States v. Romero*, 559 F. Supp. 3d 437, 445 (W.D. Pa. 2021) (Ranjan, J.) (cleaned up). Specifically, he testified that "as we're approaching the intersection, you can see the Kia vehicle hesitate to stop. It did not stop [at the stop sign]. It hesitated and then pulled in front of our vehicle. . . . Lieutenant Rourke had to apply his brakes pretty heavily to avoid colliding with that vehicle." ECF 95, 14:13-

18. Lt. Rourke elaborated that Mr. Brown's driving was "careless" and "at that point we were going to initiate a traffic stop." ECF 97, 10:5-7; *see also id.* at 9:7-20 (Lt. Rourke testifying Mr. Brown's vehicle failed to yield right-of-way at stop sign).

The dashcam video corroborates this testimony; it shows that Mr. Brown entered the intersection in full view of the officers' fast-approaching vehicle, essentially cutting off the officers. Govt Ex. 2. Lt. Rourke needed to slam the brakes to avoid hitting Mr. Brown, as evidenced by the lurch of the passenger compartment and the fact that the vehicle came to a complete stop just one second after Lt. Rourke applied the brakes. *Id.* (00:04-00:05); ECF 95, 16:23-17:4. These facts taken together—particularly the observation of Mr. Brown cutting off the officers—establish that the officers "possessed reasonable suspicion of the alleged infraction" to support the traffic stop.[1] *United States v. Delfin-Colina*, 464 F.3d 392, 399 (3d Cir. 2006).

Mr. Brown relies on two Pennsylvania state court cases to argue that he had the right-of-way, so the officers could not have had a reasonable suspicion that he had committed a traffic violation. ECF 109, pp. 6-7. The dashcam video belies that argument, since it shows Mr. Brown cutting off the officers, who slammed on their brakes to avoid a collision. But even accepting Mr. Brown's version of the facts, they merely point to mistakes of fact by the officers, including on whether Mr. Brown used his signal or came to a complete stop. A reasonable mistake of fact doesn't violate the Fourth Amendment. *Fleetwood*, 235 F. App'x at 895-96.

---

[1] In his incident report, Det. Catanzaro cited a violation of 75 Pa. C.S.A. § 3322, which states: "The driver of a vehicle intending to turn left within an intersection or into an alley, private road or driveway shall yield the right-of-way to any vehicle approaching from the opposite direction which is so close as to constitute a hazard." Govt Ex. 1, p. 4. The facts discussed above support a reasonable suspicion that Mr. Brown violated this traffic law as well. To the extent Mr. Brown argues that the discrepancy between Det. Catanzaro's report and his testimony invalidates the stop as a mistake of fact, that discrepancy doesn't invalidate the stop. *Fleetwood*, 235 F. App'x at 895.

## II. The officers did not unreasonably extend the traffic stop when they conducted a *Terry* pat-down of Mr. Brown.

Mr. Brown next argues that Det. Catanzaro's frisk of his person was unlawful because he lacked a reasonable suspicion that Mr. Brown was armed and dangerous to justify a *Terry* frisk, ECF 99, p. 20, and that, as a result, the frisk unreasonably extended the original mission of the traffic stop. ECF 99, p. 18; ECF 129, p. 8 ("[B]oth reasonable suspicion and probable cause were lacking to justify the frisk of Mr. Brown and everything else that followed."). But neither of these arguments holds water.

Turning first to the *Terry* frisk itself, the Court finds that the officers had reasonable suspicion that Mr. Brown was armed and dangerous, justifying the frisk. The reasonable-suspicion standard "demands that the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Goodrich*, 450 F.3d 552, 559 (3d Cir. 2006) (cleaned up). But the standard also affords police officers some leeway "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* Thus, courts consider "the totality of the circumstances—the whole picture" when making this inquiry. *Id.*

The officers pointed to several compounding factors giving rise to reasonable suspicion that Mr. Brown was armed and dangerous. First, Det. Catanzaro knew that the specific location where the stop took place was a "high crime area" where "a number of homicides," drug investigations, shootings, and gun arrests have occurred, including at the intersection where the officers pulled over the vehicle. ECF 95, 8:8-9:1. The history and reputation of the area required Det. Catanzaro to "stay vigilant" during the stop and credibly factored into his assessment. *Id.* at 9:2-5; *Goodrich*, 450

F.3d at 561 ("[T]he fact that the stop occurred in a high crime area is among the relevant contextual considerations in a *Terry* analysis.").

Next, both officers observed activity from Mr. Brown and Ms. Buckner that raised suspicion that they were armed. When the officers caught up to Mr. Brown's vehicle, they observed "frantic" and "hurried" movements from Mr. Brown that "alarmed" Det. Catanzaro. ECF 95, 18:24-19:5. In Det. Catanzaro's experience, these movements, including a "swimming motion" from behind the driver's seat to Mr. Brown's "lap area," indicated "something was being concealed or attempted to be concealed." *Id.* at 19:6-20:14. Lt. Rourke also observed these movements and testified that, based on his experience, they suggest someone is "trying to either retrieve [guns or narcotics] from inside of the vehicle or conceal [guns or narcotics] inside of the vehicle." ECF 97, 12:4-14. The Court's own view of the dashcam video corroborates the officers' accounts, and both officers credibly testified that they could see these furtive movements even more clearly than what appears on video. ECF 95, 18:19-19:3; ECF 97, 12:15-24; Govt Ex. 2 (00:32-00:57).

Then, before initiating the stop, the officers observed the passenger-side door open, which, based on their experience, set off "red flags" that "somebody was fleeing or somebody was going to discard some contraband." ECF 95, 20:1-21:11. Det. Catanzaro was concerned that "based on my experience . . . the next series of events [in this kind of situation] is somebody coming out of there and firing rounds back at our vehicle. So that's—you know, those are all things that go through my mind." *Id.* at 21:22-22:7. Lt. Rourke also stated that the passenger-side door opening was not "normal" and "added to" his suspicion that "there were either narcotics or firearms inside of the vehicle." ECF 97, 12:25-13:19. Det. Catanzaro's apprehension about the open passenger door is apparent on the video—after directing the vehicle to the side of the road, he approached the passenger-side door at "an angle behind the center post of the vehicle as cover," as he believed that "[b]ased on the totality of the

- 7 -

circumstances that I've already witnessed . . . there is possibly a weapon in play." ECF 95, 23:9-23; Govt Ex. 2 (01:17-01:23).

Taking these facts together, and given the nature of traffic stops as "dangerous encounters that result in assaults and murders of police officers," *United States v. Moorefield*, 111 F.3d 10, 13 (3d Cir. 1997), the Court concludes that the officers had the requisite reasonable suspicion to justify a *Terry* frisk of Mr. Brown.

With the officers' reasonable suspicion established, the *Rodriguez* inquiry is largely moot. Assuming the "*Rodriguez* moment" was immediately prior to the frisk (as the parties do[2]), the officers had ample reasonable suspicion to remove Mr. Brown from the vehicle and pat him down for weapons, as outlined above. Thus, the stop was not unreasonably prolonged.

### III. Det. Catanzaro's pat-down did not exceed the lawful bounds of *Terry*.

Mr. Brown also argues that Det. Catanzaro's pat-down exceeded the scope of a permissible *Terry* frisk because he reached into Mr. Brown's pocket, as opposed to just patting him down for weapons. ECF 99, pp. 23-25. The Court disagrees, based on its credibility determination of the testimony and its independent review of the dashcam video.

Det. Catanzaro testified that he observed a crack pipe in plain view butting out of Mr. Brown's pocket before patting him down. ECF 95, 42:8-20. He immediately recognized the object as a crack pipe. *Id.* at 40:24-41:25. The dashcam video shows exactly that. To the Court's eye, after Mr. Brown removed his right hand from the vehicle, Det. Catanzaro replaced it and, before patting Mr. Brown down, clearly appeared to observe something in his pocket. Govt Ex. 2 (03:48-03:50). Det. Catanzaro's arm and hand did not move during his observation. *Id.* Only then did

---

[2] ECF 99, pp. 18-19; ECF 106, p. 17.

Det. Catanzaro reach into Mr. Brown's pocket and remove the contents he had seen in plain view. *Id.* (03:51). Based on these movements in the video, the Court finds that Det. Catanzaro's testimony is credible, and that he saw the crack pipe in Mr. Brown's open pocket in plain view; thus, he properly seized the crack pipe without exceeding the scope of *Terry* under the plain-view exception.[3] *See United States v. Focareta*, No. 05-227, 2006 WL 2087515, at *11 (W.D. Pa. July 25, 2006) (Conti, J.) (valid seizure of marijuana and pipe from defendant's hoodie pocket under plain-view exception where officer's flashlight reflected off pipe during valid *Terry* stop), *aff'd*, 283 F. App'x 78 (3d Cir. 2008).

At the suppression hearing, Mr. Brown's counsel and investigator provided evidence to re-create the scene—including the baggy clothing that Mr. Brown was wearing and providing a demonstrative comparable to a crack pipe—to try to undermine this testimony and show that it would have been impossible to see a small crack pipe in a baggy pocket. Def. Ex. B; ECF 97, 88:4-104:21. While that presentation was creative, the Court finds the dashcam video to be more persuasive in the end and corroborates Det. Catanzaro on this point.

### IV. The officers had probable cause to search the vehicle.

Mr. Brown argues that the officers were not authorized to search the vehicle[4] and that the search unlawfully diverted from the mission of the traffic stop. ECF 99, p. 26. The Court disagrees on both counts.

---

[3] The elements of the plain-view exception to the warrant requirement are: "first, the police must not be in violation of the Fourth Amendment when they discover the items seized; second, that the discovery of the items was inadvertent; and third, that the incriminating nature of the items was readily apparent." *Focareta*, 2006 WL 2087515, at *11.

[4] The government argues that Mr. Brown lacks standing to challenge the search of the vehicle because he was the non-owner driver, and the owner was present as his passenger. ECF 99, pp. 21-24. The Court doesn't reach this issue and will assume for present purposes that Mr. Brown has standing to challenge the search.

"If there is probable cause to believe a vehicle contains evidence of criminal activity, an officer may search any area of the vehicle in which evidence might be found. Probable cause requires a fair probability that contraband or evidence of a crime will be found in a particular place, and is based on the totality of the circumstances available at the time of the search." *Gomez v. Markley*, 385 F. App'x 79, 82-83 (3d Cir. 2010) (cleaned up).

The officers here had the requisite probable cause. First, as already explained, the officers had accumulated reasonable suspicion that drugs or guns were hidden in the vehicle even before they started the traffic stop. ECF 95, 18:19-20:14; ECF 97, 12:4-24. That suspicion matured into probable cause when Det. Catanzaro saw the crack pipe in plain view on Mr. Brown's person, if not even earlier. ECF 95, 42:23-43:2 ("Q. So at that point after you see the crack pipe, what are you thinking now? A. He's under arrest. Q. Why? A. Possession of drug paraphernalia."); ECF 97, 25:11-19 ("Q. And after seeing that crack pipe, what are you thinking? A. That there are probably more narcotics or paraphernalia inside of the vehicle or on one of the occupants."). Then, importantly, after directing Mr. Brown to the curb following the pat-down, Det. Catanzaro spoke to Ms. Buckner, who specifically said that Mr. Brown "has a gun."[5] ECF 95, 46:2-6. That statement, coupled with the facts already in play, established the requisite probable cause to search the vehicle.

Testimony from Lt. Rourke further bolsters the officers' probable cause to conduct the search. After Det. Catanzaro located the crack pipe, he placed it on the ground. ECF 95, 42:21-22. Lt. Rourke moved the crack pipe to the driver's seat to

---

[5] Ms. Buckner testified at the hearing and submitted an affidavit stating that she did not make this statement. ECF 97, 66:16-23; Def. Ex. K. The Court observed the testimony from Ms. Buckner and the officers and reviewed Ms. Buckner's statement and the officers' rebuttal declarations (ECF 94), and finds the officers to be the more credible on this point.

ensure the evidence would not be destroyed; in doing so, he "observed the bottom portion of a firearm under the seat" and in plain view. ECF 97, 25:24-27:6. Lt. Rourke immediately recognized the object as a firearm. *Id.* The dashcam video corroborates this testimony, as it tracks Lt. Rourke's apparent observations. Govt Ex. 2 (04:48-05:08). His plain-view observation of the weapon likewise provided probable cause to search the vehicle.

Because the officers here had probable cause that the vehicle contained evidence of a crime, a cut above reasonable suspicion, they could expand the scope of the initial traffic stop. *See United States v. Burrus*, 845 F. App'x 187, 190 (3d Cir. 2021) ("To expand the scope of a traffic stop beyond its initial purpose, an officer must have a reasonable, articulable suspicion of criminal activity." (cleaned up)). So as with the pat-down, the Court finds no *Rodriguez* violation with respect to the search of the vehicle.

Mr. Brown argues that once the officers found the crack pipe, they could have simply issued a citation or arrested Mr. Brown; there was no need to search the car. ECF 99, pp. 26-7. But this ignores the other facts known to the officers, including the furtive movements in the car, Ms. Buckner's attempt to exit the vehicle, the discovery of drug paraphernalia on Mr. Brown's person, and then, shortly after the pat down, the observation of the gun by Lt. Rourke, and Ms. Buckner's statement to police about the gun.[6] Assuming the pat-down was the "*Rodriguez* moment," the officers had

---

[6] To be clear, possessing a gun, standing alone, isn't a basis to search a car; after all, a person may have a permit to carry a weapon. But the officers here had probable cause to search the car for drugs based on their observation of furtive movements, the passenger door opening, and the discovery of the crack pipe. Plus, the presence of a somewhat hidden gun (even if lawfully owned), along with probable cause of evidence of a drug-related crime, provides a reasonable inference of drug trafficking. *See United States v. Prather*, 279 F. App'x 761, 766 (11th Cir. 2008) ("When law enforcement officers stumble across hidden guns during a lawful search for drugs, they are allowed to draw the reasonable inference that the guns may be related to drug trafficking occurring at the location." (citation omitted)); *see also United States*

probable cause to prolong the stop, and ultimately search the car—indeed, courts have found probable cause under the automobile exception with far less than what is presented in this case. *See, e.g.*, *United States v. Byrd*, 813 F. App'x 57, 61 (3d Cir. 2020) ("[T]he smell of marijuana alone, if articulable and particularized, may establish not merely reasonable suspicion, but probable cause to search a vehicle." (cleaned up)).

## V. There is no evidence of a Fifth Amendment violation.

Finally, Mr. Brown raised in his pre-hearing motion that the officers may have violated Mr. Brown's Fifth Amendment rights when they questioned him on the curb. ECF 51, pp. 10-11. But based on Det. Catanzaro's credible testimony that he did read Mr. Brown his rights before questioning him, and that Mr. Brown waived those rights (ECF 95, 48:9-50:8), as well as Mr. Brown's signed form acknowledging his waiver of those rights (Govt Ex. 7), the Court concludes there was no Fifth Amendment violation.[7] Further, Mr. Brown did not raise any violation of his Fifth Amendment rights at the suppression hearing or in his post-hearing brief.

Upon review of the record, the Court finds there was no constitutional violation committed during the stop. There is thus no basis to suppress any of the evidence recovered or statements made.

---

*v. Mitchell*, No. 09-105, 2013 WL 12202656, at *4 (W.D. Pa. Sept. 27, 2013) (Cercone, J.) ("It has long been recognized that firearms are relevant evidence in the prosecution of drug-related offenses, because guns are known to be 'tools of the trade' of drug trafficking." (citations omitted)).

[7] The only evidence to the contrary was Ms. Buckner's testimony that she was not read her rights. ECF 97, 67:13-68:23. But as explained above, the Court finds the officers' testimony more credible.

- 13 -

## **CONCLUSION**

For these reasons, the Court will deny Mr. Brown's motion to suppress. An appropriate order follows.

DATE: May 8, 2023

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge